Filed 7/2/14  P. v. Velez CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MONICA VELEZ,<br><br>        Defendant and Appellant. | A136995<br><br>(San Mateo County<br>Super. Ct. No. SC074436) |

Monica Velez (appellant) appeals from a judgment entered after the trial court denied her motion to suppress evidence, accepted her no contest plea to one count of child endangerment (Pen. Code, § 273a, subd. (a)), and sentenced her to four years of probation.  She contends the trial court erred in denying her motion to suppress evidence. We reject the contention and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

On October 14, 2011, an information was filed charging appellant and her father, Herman Valencia Velez (Herman), with various crimes.  It charged appellant with possession of methamphetamine for sale (Health & Saf. Code,[1] § 11378; count 1),

---

[1]All further statutory references are to the Health and Safety Code unless otherwise stated.

1

possession of marijuana for sale (§ 11359; count 4), and child endangerment (Pen. Code, § 273a, subd. (a); count 5).[2]

On January 11, 2011, appellant filed a motion to suppress evidence. The following facts were presented at the hearing on the motion:[3] On the morning of October 12, 2010, Deputy Sheriff Michael Marty had a search warrant for Herman's person, his van, and the residence at 721 Third Avenue in Redwood City. That same morning, Deputy Sheriff Jacob Trickett was on the 700 block of Third Avenue looking for Herman, when he spotted Herman driving westbound on Third Avenue, from 756 Third Avenue to 703 Third Avenue. Herman parked and exited his van at 703 Third Avenue, went onto the yard of the property, and after approximately five minutes, returned to his van and drove off. After being advised that Herman was about to leave the area in his van, Marty stopped the van. He conducted a search and found a scale, a small portion of crystal methamphetamine, and a small amount of marijuana on Herman's person. Marty detained Herman. Marty and his search team then proceeded to conduct a search of 721 Third Avenue, and of 703 Third Avenue, which was listed as Herman's address on a previous driver's license.

Before going to 703 Third Avenue, Marty contacted County Communications to obtain information about the residents of 703 Third Avenue. He learned that Herman Mark Anthony Velez (Mark Anthony)—Herman's son—had listed it as his residence, and that Mark Anthony was on probation in San Mateo County with search and seizure terms. Marty followed up on this information by contacting adult probation and speaking to the on-call probation officer, Melissa Ewing. Ewing told Marty that Mark Anthony was on probation and that his residence of record on October 12, 2010 was 703 Third

[2]The information charged Herman with appellant in counts 1 and 4, and charged him alone in counts 2 (transportation of methamphetamine; § 11379) and 3 (possession of a firearm by a felon; Pen. Code, § 12316, subd. (b)(1)).

[3]The parties stipulated that the motion to suppress evidence, which was heard before the preliminary hearing, would be deemed as if it had been heard at the preliminary hearing. The parties waived "any procedural irregularities" and proceeded with the "stand-alone" motion to suppress evidence.

Avenue.  Neither Ewing nor County Communications told Marty that Mark Anthony was in jail.

According to Ewing, a computer printout showed four addresses for Mark Anthony beginning on June 21, 2008, and changing on September 29, 2008, July 20, 2009, and July 9, 2010.  The addresses were 1631 Sunnyvale-Saratoga Road, then 703 Third Avenue, then 1309 Marshall Street, then 721 Third Avenue.  According to probation officer Jeff Morino, who reviewed Mark Anthony's probation file in response to the defense's discovery requests, there were three different addresses for Mark Anthony between 2008 and 2010.  The most recent entry showed a citation Mark Anthony received on January 3, 2010, which listed his address as 703 Third Avenue.  The next entry was from a rap sheet printed on July 22, 2010, which listed his address of record with the Department of Motor Vehicles as 703 Third Avenue, and also listed a mailing address of 1632 Sunnyvale-Saratoga Road in Sunnyvale.  There was one more entry, which was a booking sheet from when Mark Anthony was booked into custody on February 21, 2009, which listed his address as 1305 Marshall Street, No. 305.

When Marty went to 703 Third Avenue, he encountered appellant, who appeared to be pretty "upset" and indicated she did not want the officers to come inside the house.  Appellant told Marty that her brother, Mark Anthony, was not there because he was in jail.  Marty initially told her he did not believe her.  Marty recalled asking appellant what Mark Anthony was in jail for, but it was difficult to get answers from her because she was upset.  Special Agent John DeFelice, an adult probation officer who was part of the search team, testified that as he stood in the driveway, he saw appellant sticking her head out of a window and saying some "foul words."  Appellant also said that the man they were looking for was not there, and that it was not his house.

Marty asked DeFelice whether Mark Anthony was in custody.  DeFelice responded that he believed he was.  According to Marty, when he asked DeFelice if they were allowed to search a probationer's residence while he was in custody, DeFelice

replied, "Absolutely. I do it all the time."[4] DeFelice testified that he told appellant that as far as he knew, that was Mark Anthony's address of record, that Mark Anthony was on probation with search and seizure terms, and that they had the right to search. He did not take steps to confirm whether Mark Anthony was in jail. Once Marty made sure it was "okay to be there [703 Third Avenue]," and after instructing the investigative team to limit the scope of the search to the areas that would be under Mark Anthony's dominion and control, Marty left that residence and went to 721 Third Avenue.

Inside 721 Third Avenue, Marty found some ammunition, a magazine for a firearm, and crystal methamphetamine pipes. While Marty was there, he was informed that narcotics were found at 703 Third Avenue. He therefore returned to 703 Third Avenue. There, he saw that there was only one bedroom that had any adult clothing in it. That bedroom had clothing for both men and women, and there was one adult bed and a toddler bed. There was another room in the rear that appeared to belong to a child; the search team did not search that room. In addition to appellant, there was a child inside the house and a woman who identified herself as the child's grandmother and the mother of appellant's boyfriend, Daniel White.

Appellant told DeFelice that everything in the adult bedroom was hers. Inside the bedroom, the search team found a large amount of cash in multiple denominations inside a "larger" men's leather jacket, and a large amount of crystal methamphetamine in a closet between two pairs of men's jeans.[5] The team found a Safeway pay stub belonging to White, as well as a pay check stub or business card dated October 2007 with the name Herman M. Velez and the 703 Third Avenue address on it. The team also searched outside the residence and found approximately two "kilos" of marijuana in a building in the rear of the residence.

Probation supervisor Tim Gatto testified that there are many benefits to probation searches. It ensures the probationer is in compliance with court orders, and can also

---

[4]DeFelice testified that he did not recall having such a conversation with Marty.

[5]White is approximately 5 feet 10 inches tall and weighs 215 pounds; Mark Anthony is approximately 5 feet 6 inches tall and weighs 145 pounds.

4

assist law enforcement in gathering evidence for crimes in which the probationer may be involved. A probation search also indicates to the probationer that he is being "check[ed] on." One of the primary things Gatto taught his officers was to emphasize to the probationer that he must keep his probation officer advised of his residence and whereabouts at all times. For example, if a probationer was staying with his girlfriend one night, he would be required to report that to his probation officer. Otherwise, probation would assume that he is at the residence he has provided.

Gatto testified that some probationers stay in more than one place, or give an address that is a relative's or a friend's, when they actually intend to stay elsewhere. If a probationer wishes to continue with his criminal lifestyle or hide things from his probation officer, for example, he may give one address as his residence, and stay at another in which he keeps his contraband. Gatto believed it was a "red flag" for someone to have had four different addresses in two years.

Gatto believed there was a benefit in conducting a probation search in a case such as Mark Anthony's, where the probationer has three felony cases—residential burglary, possession of methamphetamine, and possession for sale of marijuana—and goes to jail to serve a probation violation on January 12, 2010, and is not due to be released until October 30, 2010. He testified, "somebody with three felony cases is a red flag for us right away that that's somebody who's going to be a high-profile case for us, somebody who's involved with drug sales and drug possession. And we want to make sure we have a handle on it." In such a case, a probation search would verify that the residence is actually his, and would also enable probation to determine whether it is an appropriate residence for the probationer. Gatto testified, as an example, that he would not want a probationer living in or returning to a home occupied by parolees. A probation search conducted before a probationer is released would also serve a community safety purpose because the probationer may have hidden drugs or firearms in the residence.

Maria Velez Valencia (Valencia), the mother of Herman and the grandmother of Mark Anthony and appellant, testified that she had owned the house located at 703 Third Avenue for almost 40 years. Herman, his wife, and their children, including Mark

5

Anthony and appellant, lived at the house with Valencia and her husband from the time Mark Anthony was a baby. Herman's wife moved out when Mark Anthony was eight months old but Herman and the children continued to live there. Everyone eventually moved out, and Mark Anthony was the last to go, at the age of 16, when he moved to Santa Clara to be with his girlfriend. Even after Mark Anthony moved out, he was always welcome in the home, which was like a family home. He lived in Santa Clara for a year or two and visited her at the house during that time. Herman was also always welcome in the home, with the exception of one incident in which he was not respectful towards Valencia and she told him to leave.

Valencia and her husband moved out of 703 Third Avenue in October 2008 and rented it to a non-relative renter who lived there until January 2010. While the renter was there, Valencia's nephew also lived there, in a little room in the back of the house. Appellant and her two children moved into the house in May 2010 and lived there through October 2010. Appellant had a boyfriend named Danny White, but Valencia believed White never lived at the house.

When asked why Mark Anthony's bank records were found in the home, Valencia responded that it was because he was "not established in one place" and was "like, homeless," so "most the time, he drop in my house," and it was "normal" for him to leave things there. When Valencia said "homeless," she meant that Mark Anthony lived in various places, including with his mother in Redwood City, with his girlfriend, or with appellant at 703 Third Avenue, "once in a while." Valencia explained that after Mark Anthony got out of jail, "nobody want[ed] him" because police would come knock on the door looking for "this and that."

After Valencia moved out of 703 Third Avenue, she would go back to visit appellant and appellant's baby. During those visits, she never saw Herman or Mark Anthony there. She was aware that Herman received mail at 703 Third Avenue, but she testified that "a hundred people," including people who did not "even live there," also received mail there. She did not recall ever receiving mail for Mark Anthony there.

6

Valencia testified that at the time of the hearing, Herman was living at 721 Third Avenue and that Mark Anthony was living with his girlfriend in Redwood City.

Recalled as a witness, Marty was asked by the court to explain what triggered his decision to conduct a probation search at 703 Third Avenue. Marty explained that he believed "a family business of selling narcotics" was being conducted at 721 Third Avenue. Then, on the morning of October 12, 2010, he learned that Mark Anthony's address was down the street and that he was on probation with search and seizure terms. Those factors triggered the decision to conduct a search at 703 Third Avenue.

The parties stipulated that on October 12, 2010, Mark Anthony was on felony probation with search and seizure terms for residential burglary, possession for sale of marijuana and possession of methamphetamine. It was also stipulated that Mark Anthony was booked just after midnight on January 12, 2010, using the address 721 Third Avenue in Redwood City. He was born March 24, 1987, weighed 145 pounds and was 5'6" tall. He was in jail from January 12, 2010 until his release on October 30, 2010. The court received a certified declaration relating to Herman's driver's license indicating he was born September 5, 1964, that his mailing address as of October 2, 2007 was 703 Third Avenue, and that his address as of May 4, 2009 was 721 Third Avenue.

After hearing testimony and argument by counsel, the magistrate stated, "If the probation search is not arbitrary and capricious, [it] . . . is not going to be second-guessed. There is no further collective intent or purpose that needs to be shown by the probation department with reference to a probation search. The question is: Was the search reasonable? It was, if the residence address searched was the residence of the probationer and if the probationer was truly on probation or if there was a reasonable belief that this was the address. [¶] So what does a police officer have to do to validly conduct a probation search? He has to verify the probationer status. He has to verify the address of the probationer. That's what they did in this case. They called the probation department. The probation officer testified, and . . . Marty testified as to the steps that he took. He verified probationary status. He verified the address."

The magistrate continued: "Now, the defense has questioned whether or not the

7

probation department should have had a different address for this particular probationer. Was there an unreasonable error made here by the probation department? Should this search be found unreasonable, and thus, the reliance unreasonable, based on a probation mistake? I can't say that's been shown. This was, based on the evidence, sketchy at best, the most permanent address for the probationer, [Mark Anthony]. [¶] He lived there for 16 years, from zero to 16. Even his grandmother didn't know where he was living. And she even said that after the time that he supposedly moved out of 703 Third, that he did go back and live with [appellant] from time to time. And so I don't think that it was unreasonable for the probation department to have made the determination that they did to the extent that that's necessary for a finding here. But it certainly wasn't unreasonable [for] . . . Marty to have relied on what he was told. [¶] Even if there was a mistake, even if the courts should find that this was unreasonable on the part of the probation department based on the evidence produced here, then the question is, does it justify the use of the exclusionary rule if there was a good-faith effort made, if any errors or mistakes were, nevertheless, conducted in good faith. [¶] And I think under the *Herring* case, that I do not find that the exclusionary rule is appropriate here. [¶] Under these circumstances, based on that analysis, I'm going to deny the motion to suppress."

On June 13, 2012, appellant filed her motion to suppress evidence in the superior court. On July 13, 2012, the motion was heard by the trial court, which reviewed the reporter's transcript of the proceedings, heard argument by counsel, and denied the motion.

Thereafter, appellant pleaded no contest to child endangerment, and the remaining counts were dismissed. The trial court suspended imposition of sentence and placed appellant on probation for four years with various conditions, including five months in county jail.

## DISCUSSION

Appellant contends the trial court erred in denying her motion to suppress evidence because the probation search violated her Fourth Amendment rights. We reject the contention.

8

"When reviewing the denial of a motion to suppress evidence, [the appellate court] view[s] the facts most favorably to the respondent and uphold[s] the magistrate's factual findings if supported by substantial evidence." (*People v. Watkins* (2009) 170 Cal.App.4th 1403, 1408; *People v. Redd* (2010) 48 Cal.4th 691, 719.) Whether a search is constitutionally reasonable is a legal question upon which the appellate court exercises its independent judgment. (*People v. Hughes* (2002) 27 Cal.4th 287, 327; *People v. Medina* (2007) 158 Cal.App.4th 1571, 1575.)

"The Fourth Amendment proscribes all unreasonable searches and seizures, and it is settled that warrantless searches are per se unreasonable unless they come within an established exception to the warrant requirement. [Citation.] A search by police under an adult probationer's search condition comes within an exception." (*People v. Hoeninghaus* (2004) 120 Cal.App.4th 1180, 1184.) "[A] person may validly consent in advance to warrantless searches and seizures in exchange for the opportunity to avoid serving a state prison term." (*People v. Robles* (2000) 23 Cal.4th 789, 795.)

It is well established that a person's advance consent will justify a probation search of an area shared by nonprobationers over which the probationer has "common authority." (*U.S. v. Matlock* (1974) 415 U.S. 164, 171 [94 S.Ct 988, 993]; *People v. Woods* (1999) 21 Cal.4th 668, 678–681.) The common authority theory of consent rests "on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of [them] . . . might permit the common area to be searched." (*U.S. v. Matlock*, *supra*, 415 U.S. at p. 171, fn. 7 [94 S.Ct. at p. 993, fn. 7].) Thus, if a person lives with a probationer, common or shared areas of their residence may be searched by officers aware of an applicable search condition. (*People v. Robles*, *supra*, 23 Cal.4th at p. 798 [cohabitants have no cause to complain of searches that are reasonably and objectively related to the purposes of probation].)

There is a reduced expectation of privacy that stems from the principle that one who shares "joint access or control for most purposes" over an area will be "held to have

assumed the risk" that a co-occupant might consent to a search of the premises or effects. (*U.S. v. Matlock*, *supra*, 415 U.S. at p. 171 & fn. 7 [94 S.Ct. at p. 993 & fn. 7]; *People v. Jenkins* (2000) 22 Cal.4th 900, 977.) Cotenants of a probationer maintain normal expectations of privacy only over their persons and residential areas subject to their exclusive access or control, provided there is no basis for officers to reasonably believe the probationer has authority over those residential areas. (*People v. Robles*, *supra*, 23 Cal.4th at p. 798.)

Appellant first challenges the probation search on the ground that Mark Anthony was in jail and therefore did not have the actual or apparent authority to consent to the search. She points out that he "had been in jail for the 10 months prior to the search," had given 721 Third Avenue as his address when he was booked in jail in January 2010, "was not on the lease" for 703 Third Avenue, did not contribute to the rent or have a key to the residence, and did not have any furniture or household effects in the home except "a financial statement dated 2007."

Before beginning the search, however, Marty contacted County Communications to find out who lived at 703 Third Avenue. He was informed that Mark Anthony had listed the address as his residence and that he was on probation with search and seizure terms. He followed up on this information by contacting adult probation and speaking with on-call probation officer Ewing, who had access to Mark Anthony's file and confirmed that his residence of record on the day of the search was 703 Third Avenue. Neither informed Marty that Mark Anthony was in jail. It was therefore reasonable for Marty to conclude—based on confirmation from two official channels—that the residence he and his team were about to search was that of a probationer who had consented to search and seizure terms.

Appellant relies on *Illinois v. Rodriguez* (1990) 497 U.S. 177 [110 S.Ct. 2793] in support of her position that Mark Anthony did not have actual or apparent authority to consent to a search of 703 Third Avenue. Her reliance on the case is misplaced. There, the United States Supreme Court held that a woman's consent to the search of an apartment she used to share with the defendant and her two children, but in which she no

10

longer lived, did not justify a warrantless search of the apartment. (*Id*. at p. 181 [110 S.Ct. at p. 2797.) Appellant tries to draw an analogy between the two cases by noting that Mark Anthony, like the woman in *Illinois v. Rodriguez*, was not on the lease to the residence and did not contribute to the rent. *Illinois v. Rodriguez*, however, did not involve a probation search, and there was no confirmation from any officials in that case that the apartment they searched was one in which the woman resided. In contrast, here, officers received information from two official sources that the house they were about to search was the residence of a probationer who had agreed to search and seizure terms.

Appellant also asserts that once she told the officers that Mark Anthony was in jail, they had the duty to inquire further to confirm whether this information was true. She has not cited any authority, however, for her purported position that officers are prohibited from conducting probation searches when the probationer is in jail. As noted, probation supervisor Gatto explained that a search of a probationer who is in jail benefits the community in various ways, including allowing probation to determine whether the probationer will be returning to an appropriate residence, and ensuring that there are no hidden drugs or firearms at the residence. In some situations, it can also assist probation in investigating crimes in which the probationer may be involved. A probation search also indicates to the probationer that he is being "check[ed] on," and that he needs to provide an accurate and updated address to his probation officer at all times. Because appellant has not shown that officers are prohibited from conducting probation searches for probationers who are in jail, the fact that the officers in this case could have taken additional steps to verify Mark Anthony's residence does not undermine the magistrate's determination that they acted reasonably based on information that was available to them at the time of the search.

Next, appellant argues that the search of the adult bedroom was unreasonable because police "had no reason to believe" that Mark Anthony had "joint access [to] or control" of that bedroom. She points out that the bedroom, which was the only adult bedroom in the house, had only one adult bed, and that she had told the officers that everything in it was hers. However, appellant's statement that everything in the room

11

belonged to her was not credible in light of the fact that the room contained both men's and women's clothing, as well as indicia of occupancy by Mark Anthony. The officers were therefore not required to end their search based on that statement. Moreover, there was nothing in the record to suggest what the specific sleeping arrangements were, or who stayed at the residence on any given day. As noted, appellant and Mark Anthony's grandmother, Valencia, testified that the house was a family home in which many family members lived and stayed throughout the 40 years that Valencia and her husband owned it. Mark Anthony lived there from the time he was a baby until he was 16-years-old, and was always welcome in the home after he moved out. When asked why Mark Anthony's bank records were found in the bedroom, Valencia explained that it was "normal" for him to leave things in the house because he was "not established in one place" and would "most the time, . . . drop in my house." Valencia also testified that Mark Anthony was "homeless" and stayed in various places at various times, including with his mother in Redwood City, with his girlfriend, or "once in a while," at 703 Third Avenue. It was not unreasonable for the police to believe that the adult bedroom was one over which Mark Anthony had joint access or control.

The cases on which appellant relies are inapposite. She cites to *People v. Baker* (2008) 164 Cal.App.4th 1152 (*Baker*), for example, to support her claim that the bedroom search was unreasonable. In *Baker*, the court held that the search of a purse belonging to a female passenger could not be justified by the male driver's parole search conditions. (*Id*. at p. 1156.) Baker was the only passenger in a car that was stopped for speeding, and the purse was sitting at her feet. When Baker was ordered to exit the car, she did so without taking her purse or asserting ownership of the purse. (*Ibid*.) On those facts, the court concluded "there could be no reasonable suspicion that the purse belonged to the driver, that the driver exercised control or possession of the purse, or that the purse contained anything belonging to the driver." (*Id*. at p. 1159.)

In contrast, here, there were no circumstances that indicated the contraband and currency belonged to appellant only, and not Mark Anthony. The large amount of crystal methamphetamine was found in a shelf in the closet between two pairs of men's jeans,

12

and the currency was found in a men's jacket hanging in the room. Indicia of occupancy by Mark Anthony was also found in the room. The contraband and money were not found in appellant's immediate presence and the officers could reasonably conclude that Mark Anthony had access to the items.

*People v. Montoya* (1981) 114 Cal.App.3d 556 is similarly distinguishable. There, the court held that the a parole agent was under a duty to inquire as to who owned a pair of jeans before searching it, because the agent subjectively believed that it was equally likely the jeans belonged to the defendant, a nonparolee, as it was that they belonged to a second guest known to the agent to be a parolee with a search condition. (*Id.* at pp. 561–564.) Here, in contrast, there was sufficient evidence from which the magistrate could reasonably find that the house that was searched was Mark Anthony's residence, and that the contraband that was found in the adult bedroom between two pairs of men's jeans, was his, and not his sister's.

Finally, appellant argues that the search "over her express objection rendered it unreasonable as to her." She argues that any consent Mark Anthony gave by agreeing to a search and seizure clause was overridden because she was physically present when the officers came to the house and expressly objected to the search. She relies on *Georgia v. Randolph* (2006) 547 U.S. 103, 111–114 [126 S.Ct. 1515, 1521–1523] (*Randolph*) to support her claim, but her reliance on the case is misplaced. In *Randolph*, the United States Supreme Court held that police may not conduct a warrantless search with the consent of an occupant based on the consent of one occupant when another co-occupant expressly refuses to consent. (*Id.* at pp. 114–115 [120; 126 S.Ct. at pp. 1523–1524, 1526].) *Randolph* is distinguishable from this case because it did not involve a probation or even a parole search. (*Ibid.*) Appellant has not cited—and we have not found—any California cases that have applied the principles in *Randolph* to cases involving probation searches. Here, because the officers knew that Mark Anthony had consented to a probation search and seizure clause, it was reasonable for them to believe they could lawfully search all portions of the house over which they believed he had complete or joint control.

In any event, even assuming the search violated appellant's Fourth Amendment rights, we conclude the evidence was properly admitted under the good faith exception. In *Herring v. U.S.* (2009) 555 U.S. 135, 137 [129 S.Ct. 695] (*Herring*), the United States Supreme Court stated, the " ' "exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.' " ' " (*Id*. at p. 141; see also *People v. Robinson* (2010) 47 Cal.4th 1104, 1124.) Thus, deterrence is needed—and exclusion is therefore proper—only where the law enforcement action in question constitutes " 'deliberate', 'reckless', or 'grossly negligent' " or systematically negligent police conduct. (*Davis v. U.S.* (2011) ____ U.S. ____ [131 S.Ct. 2419, 2426–2427, 180 L.Ed.2d 285].) Absent such "culpable conduct," the exclusionary rule should not be used simply to remedy a Fourth Amendment violation. (*Ibid*.) Accordingly, the exclusionary rule does not apply when "police act[] with an objectively reasonable good faith belief that their conduct is lawful." (*Id*. at p. 2427.)

Here, the officers' actions were not grossly negligent, as the officers reasonably relied on two official sources informing them that a probationer who had agreed to search and seizure terms lived at 703 Third Avenue. Appellant asserts the officers were grossly negligent when they failed to confirm the truth of her statement that her brother was in jail and did not live there. However, as noted, she has not shown the officers would have been prohibited from searching the residence, even if they had learned that Mark Anthony was, in fact, in jail. " 'Gross negligence' long has been defined as with a " ' " 'want of even scant care' " ' " or " ' " 'an extreme departure from the ordinary standard of conduct.' " ' " (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 754.) Because the officers in this case relied in good faith on the information they had received from two separate official channels, the exclusionary rule did not apply and the trial court did not err in denying appellant's request to suppress the evidence

## DISPOSITION

The judgment is affirmed.

_____

McGuiness, P.J.

We concur:

_____

Siggins, J.

_____

Jenkins, J.